Filed 7/26/22 In re E.S. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re E.S. et al., Persons Coming Under the Juvenile Court Law. | B315846 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.F.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 20LJJP00331A–C |

APPEAL from orders of the Superior Court of Los Angeles County, Michael C. Kelley, Judge. Affirmed.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Appellant J.F. (mother) appeals determinations made under Welfare and Institutions Code section 366.21, subdivision (f)[1] by the juvenile court that it would be detrimental to return two of her daughters to her custody and that she had been afforded reasonable reunification services. We conclude substantial evidence supports the findings of the court that it would have been detrimental to return the girls to their mother's home at that time. We also conclude, as the court did, that the Los Angeles County Department of Children and Family Services (Department) provided reasonable reunification services. Accordingly, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1.    Initial Proceedings

At the outset of these proceedings, mother had sole legal and physical custody of her three children: Emma (age 14), Lucy (age 8), and Donna (age 6).[2] The Department filed a petition under section 300, subdivisions (a) and (b), regarding the children in May 2020. The Department's involvement with the family was triggered by a domestic violence incident between mother and her boyfriend, James V., in which mother kicked James out of the house. He attempted to reenter the house and mother used a pocketknife to cut him. James sustained a "big gash" on his right forearm. In June 2020, the court issued a stay-away order

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] The minors' fathers are not involved in this appeal.

prohibiting James from having any contact with mother's three children.

In July 2020, the court sustained the following jurisdictional allegations as to mother:

Count a-2: "The children['s] mother … and [R.M., father of Lucy and Donna], have a history of engaging in violent altercations, in the children's presence. On a prior occasion, the father shoved the mother and pushed her face. Such violent conduct on the part of the father against the mother endangers the children's physical health and safety and places the children at substantial risk of serious physical harm, damage, and danger."

Count a-3: "On prior occasions, [R.M.] physically abused [Emma] by striking [her] face, causing the child's nose to bleed. On prior occasions, the father spanked [Lucy and Donna]. Such physical abuse was excessive and caused the children unreasonable pain and suffering. The child's mother knew or reasonably should have known of the physical abuse of the children on the part of the father and failed to protect the children. Such physical abuse of the children on the part of the father and the mother's failure to protect the children endangers the children's physical health and safety and place the children at substantial risk of serious physical harm, damage, danger, physical abuse and failure to protect."

Count b-1: "[Mother] and the mother's male companion, James [V.], have a history of engaging in violent altercations, while the children are in the home. In May of 2020, the mother caused a laceration on the mother's male companion's arm. The children have reported prior incidents where the mother and the father [*sic*] struck each other. The child Emma is a prior

3

Dependent of the Juvenile Court due to the mother's conduct. The mother's conduct places the children at substantial risk of serious physical harm."

Count b-3: "[Mother] has an unresolved history of substance abuse and is a regular user of marijuana and alcohol which negatively impacts the mother's ability to provide regular care of the children. On 05/13/2020, the mother was under the influence of alcohol when the children were in the mother's care and supervision. On 05/19/2020, the mother was under the influence of marijuana while the children were in the mother's care and supervision. On 05/19/2020, the mother had a positive toxicology screen for marijuana. Additionally, the mother allowed her male companion, James [V.], to be under the influence of marijuana and alcohol while the children were home and while no other sober adult was present. The child, Donna is of such a young age as to require constant care and supervision and the mother's actions interfere[ ] with providing regular care and supervision of the child. The child, Emma is a prior Dependent of the Juvenile Court due to the mother's substance abuse. Such substance abuse on the part of the mother and failure to insure [*sic*] sober supervision of the children place the children at substantial risk of serious physical harm."

Count b-5: "The children['s] mother … and [R.M.] have a history of engaging in violent altercations, in the children's presence. On a prior occasion, the father shoved the mother and pushed her face. Such violent conduct on the part of the father against the mother endangers the children's physical health and safety and places the children at substantial risk of serious physical harm, damage, and danger."

4

Count b-6: "On prior occasions, [R.M.] physically abused [Emma] by striking [her] face, causing the child's nose to bleed. On prior occasions, the father spanked [Lucy and Donna]. Such physical abuse was excessive and caused the children unreasonable pain and suffering. The child's mother knew or reasonably should have known of the physical abuse of the children on the part of the father and failed to protect the children. Such physical abuse of the children on the part of the father and the mother's failure to protect the children endangers the children's physical health and safety and place[s] the children at substantial risk of serious physical harm, damage, danger, physical abuse and failure to protect."

The minors were removed from mother and initially placed with a family member. The court ordered monitored visitation for mother with Donna and Lucy three times a week. Mother's case plan included a full drug and alcohol treatment program with a minimum six-month aftercare, weekly drug and alcohol testing, a 12-step program, parenting classes, individual counseling, and conjoint counseling with James if mother chose to continue their relationship. Mother was also required to abide by the court's stay-away order prohibiting contact between James and the minors. It appears the court also ordered individual counseling for each of the minors to address case issues as well as conjoint therapy for the two older girls with mother "if recommended by the children's therapist."

## 2. Permanency Hearing

### 2.1. The Department's Reports

In preparation for the 12-month permanency hearing, the Department submitted a status review report in late July 2021.

5

At that time, Lucy and Donna were residing together in a foster home and were doing well. Both minors were participating in therapy. Mother was participating in supervised visitation with the girls twice a week and visits were going well. Lucy told a Department social worker that she did not like James and was afraid of him because he hits mother. Donna had said she did not want to live with James.

Emma was residing in a different foster placement and was receiving therapy twice a week. The social worker reported that Emma received therapy to address trauma she experienced at home, hearing voices, self-cutting, and suicidal ideation. Among other things, Emma had witnessed domestic violence between mother and James in the home and had once attempted to intervene. She had also had several psychiatric hospitalizations. Emma's therapist indicated that conjoint counseling with mother could begin in July 2021. Mother had been having monitored phone calls with Emma three times a week and was in the process of transitioning to in-person visitation. Emma reported that she wanted to see mother more often.

Mother was fully participating in her case plan. She was attending classes regarding parenting, anger management, and domestic violence, participating in family counseling and individual counseling, and had completed a 12-step outpatient treatment program. Mother remained free from drugs as well. By all accounts, mother was in compliance with her case plan and showing excellent progress in drug treatment and recovery. Nevertheless, the Department noted that the children did not feel safe living under mother's care so long as mother was living with James.

Mother and James continued their relationship and in January 2021, mother gave birth to James's child, Margaret. James, who has a history of abuse of methamphetamine, voluntarily enrolled in services relating to domestic violence, anger management, parenting, and substance abuse. The Department represented that as of July 2021, mother was still living with James and was attending conjoint therapy with him. The Department indicated that mother had not made the adjustments needed to reunify with her children, i.e., she continued in her relationship with James, and recommended continuing family reunification services.

In a last minute information for the court submitted on September 22, 2021, the Department reported that mother continued to comply fully with her case plan with the exception of the 12-step program. Mother had been attending online meetings but was not yet attending in-person meetings. Mother's sponsor stated she had not yet met mother or begun working with her on the 12 steps.

The Department also reported that Emma did not want to visit with mother and wanted to live with her father and the paternal grandmother. Mother and Emma had had one conjoint therapy session in which Emma was extremely emotional and confrontational with mother and the therapist. The therapist recommended discontinuing conjoint sessions so that she could rebuild rapport with Emma. The Department expressed concern for Emma's mental health and suggested that returning her to mother's care at that time "will cause more harm to this youth."

Visits between mother and the two younger girls were excellent and the monitor reported that mother was one of the best parents she had monitored. Mother visited consistently,

appeared on time, and was very patient with the girls. Both girls had been participating in therapy sessions focusing on "irate and concerning behaviors that were reported in the initial Mental Health referral" and were now demonstrating "age-appropriate and sibling behaviors." The therapy facilitator reported that the girls would be transitioning to a "lower level of Mental Health services." Both girls had reported being fearful of James and although they missed mother, they did not want to return home if James was present because "he was mean and they were scared" and they were "scared that their mother was going to die." One of the girls acted out domestic violence during a play therapy session.

Regarding James, the Department provided several updates. First, mother had reported to the Department that James moved out of her apartment in May 2021. Both James and mother refused to provide his new address to the Department, however, and the Department expressed concern that mother was not being truthful. On September 10, 2021, James told the Department he was currently homeless and provided mother's address for purposes of mail correspondence. Second, a representative from mother's support groups (parenting, domestic violence, anger management) reported that mother and James had been attending virtual classes together since September 2020 but, two weeks earlier, began attending from different locations. Third, mother and James agreed to participate in a voluntary family maintenance case with the Department regarding Margaret. Finally, the Department expressed concern that "mother and boyfriend [James] were still living with each other for over a year since the case opened" because the Department

"would not be able to return children to her care, while the stay away order was still in place."

In a further last minute information submitted on September 27, 2021, the Department reported that Emma continued to refuse to speak with mother and planned to write a letter to the court to convey her views on placement. The Department also advised the court that a social worker informed mother that the Department would not be recommending that the children be returned to her care. The Department had an ongoing concern about James's residence because both mother and James had refused to provide an address for him. Mother replied that if the children were not returned to her at the permanency hearing, James would be moving back in with her.

### 2.2. Contested Hearing

The court conducted a contested hearing in September 2021 and October 2021. In addition to admitting the Department's reports and last minute informations, the court heard testimony from the Department's caseworker and mother.

The caseworker stated that the Department's sole concern about the family related to James and the stay-away order preventing him from being near the minors. Specifically, the caseworker testified that although mother said James had moved out of her home in May 2021, James's hats and clothing were still there when she assessed mother's home in July 2021. Further, neither mother nor James would provide a current address for James after the move-out.[3] And at a meeting in July 2021, James

---

[3] During her testimony, mother stated she did not have James's address but that he was staying with "a family member."

9

introduced himself to Department staff as mother's "fiancé." Mother also told the caseworker that if the children were not returned to her, James would be moving back into her home. Taken together, these facts led the Department to harbor concerns that mother would not abide by the stay-away order. And the fact that James and mother had a history of domestic violence was the underlying cause for concern.

Regarding conjoint therapy between mother and the children, the court confirmed that conjoint therapy had been ordered for Emma and Lucy. The caseworker explained that she had been communicating with the girls' therapists about conjoint therapy. The therapists had explained that the initial mental health referral was to address "irate behaviors" that the children were displaying earlier in the case. But because those behaviors had abated, the girls would now be transitioning to a different type of mental health care and would be working with new therapists. In the existing therapists' view, it would be better to have the girls address their fear of James and begin conjoint therapy with mother with the new therapists.

## 3.    Trial Court Orders; Appeal

The court issued written rulings on October 15, 2021. The court found that mother had made substantial progress on her case plan but determined that the children would be at substantial risk of harm if returned to her custody. Specifically, the court noted that the minors had been traumatized by witnessing domestic violence between mother and James and were still fearful of James. The court also agreed with the Department and minors' counsel and found that the Department had provided reasonable services.

10

The court ordered the Department to continue providing family reunification services for an additional six months. The court kept the stay-away order in effect, with the exception that James could participate in conjoint therapy with the minors if and when the minors' therapists deem it appropriate. The court also reiterated that the Department had discretion to liberalize mother's visitation. Finally, the court set a further hearing for April 15, 2022.[4]

Mother timely appeals.

## DISCUSSION

Mother contends the court's finding that returning Lucy and Donna to her custody would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being is not supported by substantial evidence. Further, mother argues the Department failed to provide reasonable services during the most recent period of supervision. We address these arguments in turn.

### 1.    The Detriment Finding

Mother contends insufficient evidence supports the court's finding at the 12-month review hearing that returning Donna and Lucy to her custody would be detrimental to their safety or physical or emotional well-being. We disagree.

California's dependency system is designed "to protect children from harm and to preserve families when safe for the child." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415,

---

[4] The parties have not updated this court regarding any further proceedings in the juvenile court.

11

1424 (*Tracy J.*); see also § 300.2.) During the reunification period of a dependency case, the primary focus is on preserving the family by addressing the issues that led to dependency jurisdiction. (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 507.) That means until reunification services have been terminated, "family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody." (*Tracy J.*, at p. 1424; see also §§ 366.21, 366.22.)

At each review hearing following disposition, "there is a statutory presumption that the child will be returned to parental custody." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) A court must return the child to her parent's custody unless it finds by a preponderance of the evidence that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (See § 366.21, subd. (f)(1).) The burden is on the Department to prove that the child would face some actual, non-speculative risk if she were returned to her parent's custody. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).) "In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*Ibid.*)

We review a juvenile court's detriment finding for substantial evidence. (*Tracy J., supra*, 202 Cal.App.4th at p. 1424.) Of course, we consider the evidence favorably to the prevailing party and resolve all conflicts in support of the trial court's order. (*Yvonne W., supra*, 165 Cal.App.4th at p. 1401.)

" ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.]' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. [Citations.]' " (*Tracy J.*, at p. 1424.)

We have no difficulty concluding that substantial evidence supports the court's detriment finding. As noted, the court removed Donna and Lucy from mother's custody following a domestic violence incident between mother and James. That incident was not isolated. And as a result of domestic violence in the home, Donna and Lucy developed a fear of James and did not want to return to mother's home if James was living there. The court, for its part, issued a stay-away order prohibiting James from having any contact with the girls. Yet, mother continued to live with James for the first full year of these proceedings. And although mother said that James had moved out of her home in May 2021, James's clothing and other possessions remained in her home months later. Mother and James attended online classes from the same location. James introduced himself to Department staff as mother's "fiancé." And mother told the Department that if Donna and Lucy were not returned to her, James would be moving back into the home. These circumstances caused the Department to be concerned that if the girls were returned to mother's custody, mother might allow James to have contact with them, which would likely be detrimental to their emotional well-being.

As mother notes, both the court and the Department agreed that the only issue of concern relates to James. Mother had fully complied with her case plan and was observed to be a good

13

parent. Mother also asserts that the domestic violence issues arose in the context of substance abuse, which both she and James had addressed in classes and as demonstrated by their ongoing sobriety. We agree it appears, on this record, that mother has made excellent progress in addressing some of the issues that led to the removal of Donna and Lucy. Nevertheless, there is substantial evidence supporting the court's finding that placing the girls with mother poses a substantial risk of detriment to their emotional well-being when they have said they are afraid James (with whom mother now has another child and a committed relationship) and their fear has not yet been addressed in therapy. (See *In re Alvin R.* (2003) 108 Cal.App.4th 962, 974–975 (*Alvin R.*) ["Insufficient counseling to address Alvin's emotional trauma, his expression of fear and desire not to return to father's custody, and the opinion of the social worker that returning Alvin would have an adverse effect on his emotional well-being, provide substantial evidence of substantial risk of detriment to Alvin's emotional well-being."].)

Mother analogizes this case to *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*), and claims the juvenile court inappropriately based its finding here on the vague notion that Donna and Lucy "had been 'exposed to trauma' " which she suggests was "an emotional response" by the court.

In *Blanca P., supra,* 45 Cal.App.4th 1738, unsubstantiated sexual abuse allegations were made against the father. The mother participated in parenting classes as part of her reunification plan, but she "refus[ed] to believe her husband [was] a child molester." (*Id.* at p. 1751.) The social worker and a therapist opined that the mother had "not 'internalized' what she ha[d] learned in parenting classes," and recommended against

14

reunification. (*Ibid.*) The Court of Appeal held "[t]he idea that, despite enduring countless hours of therapy and counseling (much of it predicated on the possibly erroneous assumption that her husband is a child molester), a parent who has faithfully attended required counseling and therapy sessions must still relinquish her child because she has not quite 'internalized' what she has been exposed to has an offensive, Orwellian odor. The failure to 'internalize' general parenting skills is simply too vague to constitute substantial, credible evidence of detriment." (*Ibid.,* fn. omitted.)

The circumstances in this case have no relation to those in *Blanca P.* The juvenile court here did not rely on some vague notion of failure to internalize parenting education. Rather, it was the actions mother took during these proceedings that formed the basis of the court's detriment finding. The court specifically noted that the children had expressed fear of James "and taken together with the ambiguity of mother's relationship with [James] and the reasonable doubt that if the children were released to mother that the stay-away order would be complied with and the children's unresolved issues of fear of him and alienation of mother all combine to persuade me that there would be detriment if the children were returned."

In sum, substantial evidence supports the court's finding that it would have been detrimental to the children's well-being to return them to mother's custody at the time of the permanency hearing.

## 2. Reasonable Services Finding

Mother next contends insufficient evidence supports the court's finding that the Department provided reasonable reunification services. We disagree.

15

When the juvenile court orders reunification services, the Department must provide the family with a plan that is tailored to the family's needs and designed to eliminate the circumstances that gave rise to the children becoming dependents of the court. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.) The Department "must make a good faith effort to develop and implement a family reunification plan. [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult … .' [Citation.]" (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345 (*Amanda H.*).) The Department must also find and maintain contact with service providers and keep the parent informed of whether his or her progress is consistent and compliant with the court-ordered case plan. (*Taylor J.*, at p. 1452.)

The Department's efforts to provide reunification services do not have to be perfect, but they must be reasonable given the circumstances of the case. (*In re T.G.* (2010) 188 Cal.App.4th 687, 697.) Services are reasonable if the agency identifies the family's issues, offers a case plan designed to address and eliminate those issues, maintains reasonable contact with the parents, and makes reasonable efforts to assist the parents when compliance with the case plan is difficult. (*Amanda H., supra,* 166 Cal.App.4th at p. 1345.) We review a finding that the agency provided reasonable reunification services for substantial evidence. (*Id*. at p. 1346.)

Mother complains that the Department's services were inadequate because she was not receiving conjoint therapy with Lucy and Donna and because their therapy was not addressing all case issues. As to the first issue—conjoint therapy—the case plan indicated that such therapy would be provided "if recommended by the children's therapist." And according to the Department's caseworker, the girls' current therapists had not instituted conjoint therapy because the girls were about to transition to different providers. Notably, the Department was ensuring that therapeutic services were provided to both Donna and Lucy and the caseworker had repeatedly discussed the issue of conjoint therapy with the therapists. These efforts were plainly reasonable and, as the caseworker noted, it was for the therapists to determine the appropriateness of conjoint therapy.

As to the second issue—that the girls' therapy was not addressing case issues—we disagree. At the outset of the case, the girls demonstrated "irate and concerning behaviors that were reported in the initial Mental Health referral." Understandably, their initial therapeutic work was focused on those behaviors. Once those behaviors had abated, the therapeutic work was transitioning to a different level of care that could focus on the other issues in the case, such as the girls' fear of James and expressed desire not to live in a home with him. Again, the Department's caseworker was diligent in her efforts to contact and discuss the issue with the participating therapists. That mother was dissatisfied with the pace of these efforts does not equate to a failure to provide reasonable services.

This case is distinguishable from *Alvin R., supra,* 108 Cal.App.4th 962, on which mother relies. There, the minor refused to visit with the father, substantially obstructing all

father's efforts to reunify. Conjoint therapy was deemed essential for any progress to occur, but the minor's caregiver had scheduling difficulties and insisted upon seeing a therapist near her home. The court recognized that the caregiver's demands were "a major obstacle to any reunification efforts" but held the Department responsible because "the Department's only effort to overcome this obstacle was apparently to make a referral to a therapist who had no time available to see Alvin. There was no evidence that the Department made an effort to find other therapists in the area, or that the Department attempted to find transportation for Alvin to see an available therapist further away. *Some* effort must be made to overcome obstacles to the provision of reunification services." (*Id*. at p. 973.) Here, as already explained, the Department's caseworker had already ensured the girls were receiving therapy and they were in the process of transitioning to a different level of care. Following the transition, which the caseworker was overseeing, additional case issues could be addressed, and conjoint therapy could be considered. The Department's efforts here, unlike in *Alvin R*., were designed to address the case issues and had been successful in abating the girls' behavioral issues, which had been prioritized.

In any event, even if the Department's services were inadequate, the available remedy—additional reunification services—was provided at the 12-month hearing when the court ordered the department to provide services for an additional six months. (See *Amanda H., supra,* 166 Cal.App.4th at p. 1345 ["If, at the 12-month hearing, DCFS does not prove, by clear and convincing evidence, that it has provided reasonable services to the parent, family reunification services must be extended to the

end of the 18-month period. (§§ 361.5, subd. (a), 366.21, subd. (g)(1); *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 ['[c]ourts may not initiate proceedings to terminate parental rights unless they find adequate reunification services were provided to the parents'].)"].)

In short, substantial evidence supports the court's finding that the Department provided mother with reasonable reunification services.

## DISPOSITION

The October 15, 2021 orders are affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


ADAMS, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19